```
┌─────────────────────────┐
│     THIS OPINION IS A    │
│   PRECEDENT OF THE TTAB  │
│                          │
└─────────────────────────┘
```

Oral Hearing:                          Mailed:
February 24, 2011                      September 14, 2011


**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

General Mills, Inc. and General Mills IP Holdings II, LLC
v.
Fage Dairy Processing Industry S.A.

———

Opposition No. 91118482
to application Serial No. 75597291
filed on November 30, 1998

Opposition No. 91118950
to application Serial No. 75597292
filed on November 30, 1998

Opposition No. 91155075
to application Serial Nos. 76016809; 76016810; 76016811;
76016812; 76016813
all filed on April 4, 2000

Opposition No. 91182937
to application Serial Nos. 77037793; 77037808; 77037835;
77037851; 77037869; 77037897; 77037905; 77037924
all filed on November 6, 2006

———

Craig S. Coleman and Marc C. Levy of Faegre & Benson LLP,
and Felicia J. Boyd of Barnes & Thornburg LLP for General
Mills, Inc. and General Mills IP Holdings II, LLC.

Virginia R. Richard, Lana C. Marina and Sanjana Chopra of
Winston & Strawn LLP for Fage Dairy Processing Industry S.A.

———

Before Quinn, Kuhlke and Mermelstein, Administrative
Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Applicant, Fage Dairy Processing Industry S.A., seeks registration of the marks shown below:

 Application Serial No. 75597291 for "set yoghurt –made from ewes' milk and yoghurt culture" based on an allegation of an intention to use the mark in commerce, with "SHEEP'S YOGHURT" disclaimed, and the translation statement "The Greek characters of the mark translate to 'FAGE' which means 'eat' in English";

Application Serial No. 75597292 for "strained yoghurt made from fresh cow milk, cream and yoghurt culture" based on an allegation of an intention to use the mark in commerce, with the translation statement "The Greek characters in the mark transliterate to 'FAGE' and this means 'EAT' in English";



Application Serial No. 76016809 for

"tzatziki, made of cucumbers, yogurt, garlic, herbs and

spices; and dairy products, namely, yogurt"[1] based on an

---

[1] This application also includes "sauces, spices and food flavorings, not of essential oils" in International Class 30. However, opposers have litigated this case only against applicant's use and registration of TOTAL in connection with yogurt. Due to the absence of evidence submitted during trial with regard to applicant's goods in International Class 30, and the absence of argument in opposers' brief as to anything other than yogurt, to the extent opposers' pleading alleged a claim against the goods in Class 30, we deem that opposers have waived their likelihood of confusion and dilution claims as to the goods in this class, and Opposition No. 91155075 is dismissed as to the goods in International Class 30 in Application Serial No. 76016809. Claims, counterclaims, or defenses which are not argued in a party's brief are considered waived. Corporacion Habanos S.A. v. Guantanamera Cigars Co., 86 USPQ2d 1473, 1474, n. 2 (TTAB 2008) (deceptively misdescriptive claim under Section 2(e)(1) waived), remanded on other grounds, 729 F. Supp.2d 246, 98 USPQ2d 1078 (D.D.C. 2010); Cerveceria India Inc. v. Cerveceria Centroamericana, S.A., 10 USPQ2d 1064, 1066, n.3 (TTAB 1989), aff'd, 892 F.2d 1021, 13 USPQ2d 1307 (Fed. Cir. 1989) (affirmative defenses waived); J.S. Paluch Co., Inc. v. Irwin, 215 USPQ 533, 536, n.4 (TTAB 1982) (counterclaim of abandonment waived). Cf. Hynix Semiconductor Inc. v. Rambus Inc., 98 USPQ2d 1711, 1726 (Fed. Cir. 2011) (issues not presented in opening brief waived); Finjan Inc. v. Secure Computing Corp., 626 F.3d 1197, 97 USPQ2d 1161 (Fed. Cir. 2010) (citing SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 78 USPQ2d 1097 (Fed. Cir. 2006) and noting that "arguments not raised in the opening brief are waived").

While it is true that claims need only be determined with regard to one of several items in a single international class, such that likelihood of confusion will be found as to the entire class if there is likely to be confusion with respect to any item that comes within the identification of goods in that class, see Tuxedo Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981), this determination does not extend to other international classes. See G&W Laboratories, Inc. v. G W Pharma Limited, 89 USPQ2d 1571, 1574 (TTAB 2009) ("[E]ach class of goods or services in a multiple class registration must be

allegation of first use and use in commerce in July 1998, with a disclaimer of "AUTHENTIC GREEK TZATZIKI" and the translation statement "The non-Latin characters in the mark transliterate to 'Fage', and this means 'eat' in English";

 Application Serial No. 76016810 for "dairy products, namely, yogurt" based on an allegation of first use and use in commerce in September 1998, with a disclaimer of "LIGHT" and "THE AUTHENTIC GREEK STRAINED YOGHURT" and the translation statement "The non-Latin characters in the mark transliterate to 'Fage', and this means 'eat' in English";

---

considered separately when reviewing the issue of fraud, and judgment on the ground of fraud as to one class does not in itself require cancellation of all classes in a registration."); Baseball America Inc. v. Powerplay Sports Ltd., 71 USPQ2d 1844, 1848 n. 9 (TTAB 2004) (emphasis added) ("[I]f priority and likelihood of confusion are established as to any of the goods or services identified in an *opposed class of goods* or services, the opposition to registration of the mark as to all of the goods or services *identified in that class* will be sustained"); Electro-Coatings, Inc. v. Precision Nat'l Corp., 204 USPQ 410, 420 (TTAB 1979) ("there are, in law, three applications and three oppositions to be adjudicated, because each class in a multiple class application constitutes a separate case"). Each international class stands on its own, for all practical purposes



Application Serial No. 76016811 for "dairy products, namely, yogurt" based on an allegation of first use and use in commerce in July 1998 with a disclaimer of "WITH GREEK HONEY" and "THE AUTHENTIC GREEK STRAINED YOGHURT";



Application Serial No. 76016812 for "dairy products, namely, yogurt" based on an allegation of first use and use in commerce in April 1998, with a disclaimer of "2%" and the translation statement "The non-Latin characters in the mark transliterate to 'Fage' and this means 'eat' in English";

---

like a separate application, and we must make determinations for each separate class. G&W Laboratories, 89 USPQ2d at 1573-74.



Application Serial No. 76016813 for "dairy products, namely, yogurt" based on an allegation of first use and use in commerce in November 1998, with a disclaimer of "CHERRY" and "THE AUTHENTIC GREEK STRAINED YOGURT" and the translation statement "The non-Latin characters in the mark transliterate to 'Fage' and this means 'eat' in English";

Application Serial No. 77027793 for "dairy products, namely, yogurt" based on an allegation of an intention to use the mark in commerce, with a disclaimer of "ALL NATURAL GREEK STRAINED YOGURT" and the translation statement "The foreign wording in the mark translates into English as to eat";



Application Serial No. 77037808 for "dairy products, namely, yogurt" based on an allegation of an intention to use the mark in commerce, with a disclaimer of "5%" and "ALL NATURAL GREEK STRAINED YOGURT" and the translation statement "The foreign wording in the mark translates into English as to eat";

Application Serial No. 77037835 for "dairy products, namely, yogurt" based on an allegation of an intention to use the mark in commerce, with a disclaimer of "2%" and "ALL NATURAL GREEK STRAINED YOGURT" and the translation statement "The foreign wording in the mark translates into English as to eat";

 Application Serial No. 77037851 for "dairy products, namely, yogurt" based on an allegation of an intention to use the mark in commerce, with a disclaimer of "0%" and "ALL NATURAL-NONFAT GREEK STRAINED YOGURT" and the translation statement "The foreign wording in the mark translates into English as to eat";

Application Serial No. 77037869 for "dairy products, namely, yogurt" based on an allegation of an intention to use the mark in commerce, with a disclaimer of "WITH HONEY" and "ALL NATURAL GREEK STRAINED YOGURT" and the translation statement "The foreign wording in the mark translates into English as to eat";

Application Serial No. 77037897 for "dairy products, namely, yogurt" based on an allegation of an intention to use the mark in commerce, with a disclaimer of

"WITH STRAWBERRY" and "ALL NATURAL GREEK STRAINED YOGURT" and the translation statement "The foreign wording in the mark translates into English as to eat";

Application Serial No. 77037905 for "dairy products, namely, yogurt" based on an intention to use the mark in commerce with a disclaimer of "2%" and "WITH HONEY" and "ALL NATURAL GREEK STRAINED YOGURT" and the translation statement "The foreign wording in the mark translates into English as to eat"; and

Application Serial No. 77037924 for "dairy products, namely, yogurt" based on an intention to use the mark in commerce with a disclaimer of "WITH CHERRY" and "ALL NATURAL GREEK STRAINED YOGURT" and the translation statement "The foreign wording in the mark translates into English as to eat."

Opposers, General Mills, Inc. and General Mills IP Holding II LLC (hereinafter "opposers"), opposed

9

registration of applicant's various marks on several grounds, and applicant filed answers by which it admitted that it did not use its marks in the United States prior to 1998, and filed counterclaims against opposers' pleaded registrations.  As noted in the Board order, dated November 2, 2009, applicant withdrew its counterclaims, and the remaining grounds in the oppositions before us are 1) that applicant's marks so resemble opposers' previously used and registered TOTAL marks as to be likely to cause confusion, mistake or to deceive under Trademark Act Section 2(d), 15 U.S.C. §1052(d), and 2) that applicant's marks dilute the distinctive quality of opposers' marks under Trademark Act Section 43(c), 15 U.S.C. §1127(c).  The pleaded registered marks are TOTAL in typed form for "wheat flakes"[2] and TOTAL in typed form for "ready to eat breakfast cereal."[3]

### EVIDENCE OF RECORD

As a preliminary matter, we must address a few remaining evidentiary issues.  We begin by noting the acrimonious nature of this litigation, manifested not only by the size of the record and the prosecution history but also by the excessive discourse throughout the taking of

---

[2] Registration No. 0724897, filed on March 9, 1961, issued on December 5, 1961, alleging first use and first use in commerce on February 23, 1961, renewed.

[3] Registration No. 1394264, filed on October 15, 1985, issued on May 20, 1986, alleging a date of first use and first use in commerce on February 23, 1961, renewed.

testimony and motion practice, all fraught with multiple objections and pages of arguments over whether a given objection is proper.  We understand the importance of this matter to the parties; however, we encourage parties and their counsel, not only to cooperate with each other, but also to recognize the very limited nature of the Board's jurisdiction.

The Board is an administrative tribunal of the USPTO empowered to determine the right to registration only.  The Board has no authority to determine the right to use, or the broader questions of infringement, unfair competition, damages or injunctive relief.  Even counsel at the oral hearing acknowledged that the present record is of a magnitude generally reserved for district court litigation.  Extremely rare is the Board proceeding that generates a record of the size in this case.

The first two proceedings were filed in 2000, the third in 2002 and the last one in 2008.  Thus, this dispute has been ongoing for eleven years.  The prosecution history through the conclusion of trial included 365 prosecution history entries.  For five years, from 2000 to approximately 2005, the parties represented to the Board that they were engaged in settlement negotiations.  In August 2006, at prosecution entry number 36, applicant retained new counsel.  Thereafter, opposers moved to add claims, applicant moved to

11

add counterclaims, the parties filed summary judgment motions, motions to compel, and applicant petitioned the USPTO Director, which brings us to entry number 106, and February 1, 2008.  In the meantime, in the middle of all of this, applicant, in 2006, filed eight more TOTAL applications which form the subject matter of Opposition No. 91182937.  From entry number 119, November 25, 2008, through entry number 163, August 27, 2009, the parties brought additional motions to amend pleadings, motions to compel, motions to strike, motions for summary judgment and for sanctions.

The trial begins at entry number 176, December 15, 2009, and continues through entry number 359, August 2, 2010.  These entries also include motions to strike, confidential and redacted versions of the various entries, and some duplicates.[4]  The trial record is over 20,000 pages.

---

[4] We further note the excessive marking of various information as confidential and urge parties to limit such designations.  It greatly complicates the record, and frequently the matter is improperly designated or not useful to the disposition of the case.  Edwards Lifesciences Corp. v. VigiLanz Corp., 94 USPQ2d 1399, 1402 (TTAB 2010).  Board proceedings are designed to be public, therefore, only truly confidential material should be so designated.  In cases where this is not done, the Board may require parties to resubmit those documents so that only truly confidential material is redacted.

In addition to complying with the policy that TTAB proceedings be public, where the record created is entirely or almost entirely public, briefs may be drafted to include as part of the references to the record, a citation to the relevant TTABVUE entries and page numbers.  This cross-referencing to the TTABVUE

To reiterate our frustrations expressed to the parties at the oral hearing, the issues herein do not warrant a record of this size. This is not the first time the Board has expressed its displeasure about overzealous litigation in our proceedings. See, e.g., CareFirst of Maryland Inc. v. FirstHealth of the Carolinas Inc., 77 USPQ2d 1492, 1495-96 (TTAB 2005), aff'd, 479 F.3d 825, 81 USPQ2d 1919 (Fed. Cir. 2007) ("So many of the actions herein needlessly added to the expense of the parties, not to mention the drain on resources of the Board. Many, many dollars would have been saved if the parties and their attorneys had simply cooperated in good faith with each other as this litigation proceeded for over five years.") In the most plain and concise terms we emphasize that "scorched earth" litigation tactics and "leave no stone unturned" trial strategy do not improve a party's odds before the Board.[5]

After the oral hearing the Board ordered the parties to submit a joint appendix to prepare the record for consideration on the merits and amended briefs with citations to the joint appendix. Although still formidable at over 8000 pages, entry numbers 375 – 575, the joint

---

entries greatly aids the Board when reviewing the record, particularly in cases with a large record.

[5] In addition, where the Board identifies overly contentious advocacy or the potential for the creation of excessive records, it may in the future exercise its authority under Trademark Rule 2.120(i)(2) to order a pretrial conference in person at the

13

appendix greatly assisted the Board in reviewing the record.[6]

In the July 1, 2010 Board order, the Board deferred ruling on opposers' motions to strike certain pieces of evidence submitted by applicant under Notices of Reliance and certain testimony and related exhibits of Mr. Athanassios Filippou (CEO of Fage Dairy Industry S.A. hereinafter Filippou).[7]

Specifically, opposers object to 1) emails from applicant's customers to applicant and various reports and presentations created by third parties for opposers and produced by opposers during discovery, such emails, reports and presentations all loosely referred to as "business records" by applicant and submitted under Notice of Reliance, 2) evidence of third-party use of the term TOTAL introduced into the record under testimony, 3) demonstrative exhibits created by applicant's counsel submitted under Notice of Reliance, and 4) testimony and exhibits reflecting advice of counsel.

---

office of the Board in Alexandria, Virginia. Blackhorse v. Pro Football Inc., 98 USPQ2d 1633 (TTAB 2011).

[6] Citations herein to the parties' briefs are to the amended trial briefs and citations to the record include the joint appendix reference. We note generally that a joint appendix is not required under our rules, and *should not* be filed unless specifically requested by the Board.

[7] Opposers did not maintain their objection to the testimony of Jessica La May of Country Life LLC in their brief and have, therefore, waived this objection. Wet Seal Inc. v. FD Management Inc., 82 USPQ2d 1629, 1632 (TTAB 2007).

With regard to applicant's customer emails, applicant submitted these emails under a Notice of Reliance. Separately, applicant's witness Mr. Filippou testified to their existence and to his review of them, and opposers cross examined the witness as to those emails and their content.  See, e.g., Filippou Test. pp. 61-63, 406 (JA00312-314, 428).  A Notice of Reliance may only be used for the specific categories of documents set out in the relevant rules.  See Trademark Rules 2.120(j)(3)(i), 2.120(j)(4), 2.120(j)(5), 2.122(d)(2) and 2.122(e).  However, while applicant's customer emails are not admissible under a Notice of Reliance, given the testimony on direct and cross examination, there is sufficient indicia of reliability to accept them into the record as being authenticated.  We do not consider these customer emails to be business records as defined by Fed. R. Evid. 803(6), but we are not considering them for the truth of the matter asserted therein, inasmuch as the statements therein constitute hearsay; however, we have considered their receipt by applicant and what they show on their face (e.g., references to "Fage" or "Fage total" yogurt).  As stated by opposers' counsel during cross examination, the emails "speak for themselves."  Filippou Test. p. 407 line 14; JA00428.  In view thereof, the motion to strike Exhibits 5-518; JA04225-5252 is denied.

15

With regard to the third-party reports and presentations prepared for opposer and referred to as "business records" by applicant, such documents are clearly not the type of documents contemplated for submission under Notices of Reliance by the Board's rules. Trademark Rule 2.122. However, during the course of this rather torturous litigation, stipulations were made, Board orders were issued, and follow-up email communications were exchanged by the parties, regarding the submission of evidence during trial. At one point, opposers' counsel, in an effort to avoid additional depositions, sent an email to applicant's counsel, representing that "Mr. Kaihoi's deposition is certainly not necessary to allow you to present the email to Bally's to the Board. The Board's November Order already deemed certain records as authenticated for the purpose of this trial. No additional authentication is needed for any of the parties' records." App. Appendix of Response to Objections p. 2. In fact, that part of the Board order related only to documents submitted "during opposers' testimony periods," not applicant's testimony period. November 2, 2009, Board Order p. 35. By their email, opposers extended this order to encompass applicant's testimony period. The full scope of the order is as follows:

> ...any document produced by opposer is deemed authentic and admissible into evidence if

16

> submitted by notice of reliance or through
> testimony (as appropriate) during opposer's
> testimony periods.

Id.

In view of the ambiguity arising out of opposers'
email, applicant may reasonably have believed that it could
submit produced documents under Notice of Reliance.
Accordingly, we deny the motion to strike Exhibits 23, 24,
29, 30, 32, 38, 40, 41, 42; JA05618-5632, 5647-5652, 5656-
5659, 5680-5682, 5687-5697. That being said, the probative
value of these documents is limited, to the extent that
there is very little testimony elicited as to these
documents.

As to the evidence of third-party use of the term
"total," these exhibits were properly made of record through
testimony. Opposers' arguments go to the probative value of
the evidence, not to admissibility. For example, opposers
cite to Jansen Enterprises Inc. v. Rind, 85 USPQ2d 1104,
1110 (TTAB 2007), in their effort to have this material
excluded from the record entirely. In Jansen, the Board
merely commented on the value of the evidence submitted and
whether or not it was sufficient to support a finding of
third-party use such that this factor would weigh in favor
of the defendant. This case does not stand for the
proposition that testimony and exhibits that may not provide
full information as to the sales or exposure to consumers of

this "use" is inadmissible.  Obviously it is relevant, the question is how probative it is.  In view thereof, the motion to strike Exhibits 37-38, 40, 43, 45, 77, 81, 83, 85, 91-92, 94, 100, 104, 226, 229; JA00913-915, 918-919, 930, 933-934, 1171, 952-959, 963-969, 976, 979, 2259, 2262 is denied.

Opposers also seek to strike various demonstrative exhibits created by counsel.  While it is true that summaries are permitted, Fed. R. Evid. 1006, such summaries should be introduced under testimony.[8]  There is no provision under the Trademark Rules to submit such exhibits under Notice of Reliance and these exhibits are not covered by stipulation, the November Board order, or the subsequent email exchange between counsel.  See, e.g., Trademark Rules 2.120(j), 2.122(d)(2), 2.122(e).  In view thereof, the motion to strike Exhibits 1, 2, 3, 4, 43 and 44; JA003160-3161, 4219-4224, JA05698-5701, is granted.[9]

Finally, opposers move to strike trial Exhibits 163 and 164 and Mr. Filippou's testimony regarding those exhibits.  As best as can be discerned from argument, it is applicant's position that during a discovery deposition on October 31,

---

[8] Applicant's reliance on Squirtco v. Tomy Corp., 697 F.2d 1038, 216 USPQ 937 (Fed. Cir. 1983) is misplaced.  In Squirtco, the summaries were introduced into the record by way of witness testimony, not by Notice of Reliance.

2008, its witness testified that he had relied on advice of counsel in filing the subject applications, and by this statement, applicant had waived any privilege that attached to the letters from counsel listed on the privilege log. Thus, applicant contends, opposers should have then argued that the letter from counsel on the privilege log was no longer protected; and opposers should have moved to compel production of that letter, and cannot now be heard to complain, when applicant "supplemented" its responses a day before taking the trial testimony of that witness nearly two years later on February 10, 2010, during applicant's testimony period. By this logic, if we view the witness' prior statement as a waiver, then applicant was under a duty to remove that item from the privilege log and forward it to opposing counsel as a responsive document no longer subject to privilege. This would mean that applicant actively withheld a responsive document.

In any event, we do not find the statement made during the discovery deposition to constitute a waiver of the privilege with regard to these letters. The facts of this case are closer to those of Presto Products, Inc. v. Nice Pak Products, Inc., 9 USPQ2d 1895 (TTAB 1988) (Board granted motion to strike testimony, where a party refused to produce

---

[9] Nonetheless, all of the information which forms the basis of these exhibits is in the record, which has been exhaustively reviewed.

information sought in a discovery request based on attorney-client privilege, and did not allow the party to later rely on that information as evidence in its behalf), than Vignette Corp. v. Marino, 77 USPQ2d 1408, 1411 (TTAB 2005) (Board, on summary judgment motion, considered evidence where applicant did not "unequivocally refuse to provide the requested information" noting it would be unduly harsh to impose the preclusion sanction). In fact, this case presents a more egregious set of facts than Presto in that applicant failed for two years in its duty to supplement its discovery responses. Of course, applicant could have simply introduced the trademark searches that had been produced and elicited testimony on the reliance of those searches, but instead chose this tactic. While opposers did cross examine the witness on these exhibits, they did so under protest and after lodging their objection. In view thereof, the motion to strike Exhibits 163 and 164 and related testimony is granted.[10]

---

[10] We add, however, as we did in Presto, that the striking of these exhibits and related testimony are of "no particular moment" because our determination of the issue of likelihood of confusion would be the same regardless of whether applicant adopted its mark in good faith. Indeed, we have not, in determining this case, drawn any inference of bad faith on applicant's part. Certainly, the evidence of use of the mark in Greece and throughout Europe point to applicant's good faith in simply seeking to extend its brand to the United States market. Filippou Test. pp. 35-37; JA00288-90. Moreover, there is no dispute that applicant sought advice of counsel and conducted trademark clearance searches. Nonetheless, good faith adoption of a mark is not a defense to a claim of likelihood of confusion.

The record in these consolidated proceedings is voluminous and we refer to the parties' briefs which, absent the exhibits and testimony discussed above, accurately present the evidence of record.[11]

### THE PARTIES

Opposers are the sixth largest food manufacturer in the world, selling a wide variety of products, including ready-to-eat cereal and yogurt.  David V. Clark, Opposers' Vice President of Marketing, Adult Cereal (hereinafter Clark) Test. p. 6; JA00028-29.

Applicant, Fage Dairy Processing Industry, S.A., is a Greek dairy company that introduced its Greek strained yogurt into the United States market in 1998.  Filippou Test. pp. 15, 44-45, 48-55; JA00273, 297-298, 301-303.  The record shows that applicant has been successful in its effort to market its yogurt in the United States, not only as measured by sales, but also as measured by quality. Filippou Test. p. 117, Exhs. 182, 183; JA00338, 1389-1390. Its yogurt has received several culinary awards, favorable media mentions and has a loyal and dedicated consumer fan base.  Filippou Test. pp. 87, 185-186; JA00326, 366-367;

---

E.g., Eveready Battery Co. v. Green Planet Inc., 91 USPQ2d 1511, 1516 (TTAB 2009).

[11] As noted above, much of the evidence was submitted under seal. Thus, in certain sections, the decision must necessarily present the facts in more general terms.

App. 1st NOR Exhs. 2-189; JA03162-4136; App. 2d NOR Exhs. 5-518; JA04225-5252.

## PRIORITY/STANDING

It has already been established that opposers have standing and priority in each of these consolidated proceedings. Board Order dated November 2, 2009.[12]

Accordingly, we turn to the question of likelihood of confusion.

## LIKELIHOOD OF CONFUSION

### Statement of the Law

Our likelihood of confusion determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours and Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Co.,

---

[12] For clarification we note that General Mills, Inc. was the original owner of the pleaded and proven registrations and that, during the course of this litigation, these registrations were assigned to General Mills IP Holding II, LLC, which was joined, upon motion, as a party plaintiff. See February 16, 2006, Board Order. Where there are multiple plaintiffs, each plaintiff must prove its standing and, in the case of likelihood of confusion and dilution claims, prior use. Further, as is well established, only the owner of a registration may rely on the presumptions afforded by Section 7(b) of the Trademark Act, 15 U.S.C. § 1057. Chemical New York Corp. v. Conmar Form Systems, Inc., 1 USPQ2d 1139, 1144 (TTAB 1986); Yamaha International Corp. v. Stevenson, 196 USPQ 701, 702 (TTAB 1979); and Joseph S. Finch & Co. v. E. Martinoni Co., 157 USPQ 394, 395 (TTAB 1968). To the extent that General Mills Inc. is not covered by the prior order because it is no longer the owner of the registrations, the record establishes its use of the mark in connection with ready-to-eat cereal prior to any of applicant's filing or first use dates. The manner of use of the TOTAL mark includes a basic block form

Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). Further, "[a]lthough confusion, mistake or deception about source or origin is the usual issue posed under Section 2(d), any confusion made likely by a junior user's mark is cause for refusal; likelihood of confusion encompasses confusion of sponsorship, affiliation or connection." Hilson Research, Inc. v. Society for Human Resource Management, 27 USPQ2d 1423, 1429 (TTAB 1993); Federal Bureau of Investigation v. Societe: "M. Bril & Co.," 172 USPQ 310, 315 (TTAB 1971) (under Section 2(d) party must show purchasing public would mistakenly assume that the applicant's goods or services originate with, are sponsored by, or are in some way associated with it"). See also Majestic, 65 USPQ2d at 1205 ("...mistaken belief that [a good] is manufactured or sponsored by the same entity ... is precisely the mistake that Section 2(d) of the Lanham Act seeks to prevent"); In re Save Venice New York, Inc., 259 F.3d 1346, 59 USPQ2d 1778, 1784 (Fed. Cir. 2001) ("The related goods test measures whether a reasonably prudent consumer would believe that non-competitive but related goods sold under similar marks derive from the same source, or are affiliated with, connected with, or sponsored by the same trademark owner").

---

which does not measurably alter the analysis of the similarity of the marks discussed infra.

The parties presented evidence and argument on the du Pont factors of the fame, strength and renown of the marks, the similarity or dissimilarity and nature of the goods and channels of trade, the conditions under which and buyers to whom sales are made, the similarity or dissimilarity of the marks, the number and nature of similar marks in use on similar goods, the nature and extent of any actual confusion, and the length of time during and conditions under which there has been concurrent use without evidence of actual confusion.

## Fame

We begin with the factor of fame because when fame exists it "plays a 'dominant' role in the process of balancing the du Pont factors." Recot Inc. v. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000). This is so because a famous mark "casts a long shadow which competitors must avoid.'" Id. quoting Kenner Parker Toys, Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992). Thus, "[f]amous marks enjoy a wide latitude of legal protection." Id. "[T]he fame of a mark may be measured indirectly, among other things, by the volume of sales and advertising expenditures of the goods traveling under the mark, and by the length of time those

24

indicia of commercial awareness have been evident."[13]   Bose
Corp. v. QSC Audio Products, Inc., 293 F.3d 1367, 63 USPQ2d
1303, 1305 (Fed. Cir. 2002).

As noted above, the record shows that opposers own two
registrations for the mark TOTAL, dating from 1961 (wheat
flakes) and 1986 (ready-to-eat cereal).  Opposers have been
using the mark TOTAL in connection with ready-to-eat cereal
since 1961.  Clark Test. pp. 16-18, 22-23; JA00032-34, 36-
37.  TOTAL is one of a handful of cereal brands that have
been marketed continuously for so many years and is
considered by opposers to be one of their "most prized
equities."  Id.  The sales data has been submitted under
seal, but suffice it to say that opposers' sales are
substantial, as are the expenditures on advertising.  With
regard to sales, TOTAL cereal comprises an impressive market
share in this highly fragmented market.  Clark Test. pp. 22,
53-55; JA00036, 63-65; see also Opp. 3d NOR Opposers' former
marketing director, Sean M. Foster, Dep. p. 122; JA07422

---

[13] In relation to its earlier applications, applicant argues that
opposers "have no evidence of consumer awareness of Total cereal
in 1998, the operative date in [the earlier oppositions]."  App.
Br. p. 25.  For purposes of likelihood of confusion, the Board
generally accepts and considers evidence related to likelihood of
confusion for the period up to the time of trial, and this
includes evidence of the fame of a plaintiff's mark.  This is
distinct from a claim of dilution under Section 43(c) of the
Trademark Act where an element of the claim is the acquisition of
fame prior to the defendant's first use or application filing
date.

(TOTAL ranks among the top 10 or 15 of all cereal brands).[14] Given the market share, long history of use, and extensive advertising campaigns, opposers view the mark as "iconic." Rebecca L. O'Grady, opposers' President of Yoplait Division (hereinafter O'Grady), Test. p. 10; JA00663. TOTAL cereal is sold in "pretty much any store that's selling grocer[ies]." Clark Test. p. 132; JA00104. That includes Kroger, Publix, Wal-Mart, Target, drugstores, convenience stores, discount stores, etc. Id. TOTAL branded cereal, including the flankers,[15] commands significant premium shelf space, and on the packaging the TOTAL mark is always prominently featured, as shown below. Clark Test. 138-140; JA00107-109

 [16]

---

[14] This testimony was submitted under seal, however, these specific numbers were referenced in the unredacted portion of opposers' public brief.

[15] A "flanker" cereal is essentially a flavor spin off from the baseline product.

[16] Opp. Exhs. 1, 3; JA02272, 2274.

The impact of the exposure is amplified by the number of flanker cereal products for which the TOTAL brand is used. Thus, because 93% of all households purchase cereal, as stated by opposers, "nearly all consumers are regularly exposed to TOTAL in grocery stores." Br. p. 13 and citations to record. Moreover, household penetration, i.e., the number of U.S households that have TOTAL cereal on the pantry shelf is, for this industry, very high.[17]

Opposers advertise their TOTAL brand cereal in a variety of media (national television, radio, internet, nationally distributed magazines and newspapers, coupons, and partnerships). Their advertising has been so pervasive and penetrating that one of their television commercials, the "Stacking Bowls" campaign running from the late 1960s through the early 2000s, permeated popular American culture through Phil Hartman's parody on the television show Saturday Night Live. Opposers have used public figures such as Paul Harvey and Richard Lewis to promote TOTAL brand cereal. On television, opposers have an ongoing partnership with the Food Network to feature TOTAL cereal on its programs. Clark Test. 86; JA00083. In newspapers, nutrition columns regularly feature TOTAL cereal.[18] TOTAL

---

[17] The specific number was submitted under seal.

[18] Applicant attempts to minimize the probative value of these columns because they were "written at [opposers'] direction by their paid independent contractor." App. Br. p. 28. While this

27

also is the subject of regular media mentions, including television shows such as The Biggest Loser and The Jay Leno Show.

Opposers regularly track the success of their advertising campaigns for the TOTAL brand and annually achieve high household penetration and media impressions, the average number of times an advertisement reaches a consumer over the course of a year. Opposers have achieved nearly universal household penetration with their advertising. Clark Test. p. 81; JA00078.

As part of their ordinary course of business, opposers regularly conduct consumer surveys that measure brand awareness, which is consistently very high. See e.g., Opp. Exh. 50; JA02482; Clark Test. pp. 188-219; JA00138-169; O'Grady Test. 10-14; JA00663-667.

Finally, in addition to the overwhelming evidence of TOTAL's brand awareness discussed in summary form above, opposers submitted a consumer awareness survey conducted by their testifying expert. The combined aided and unaided awareness number is very high and is in line with the numbers opposers have seen in their own regularly conducted consumer awareness surveys made during the ordinary course

---

removes them from the category of unsolicited "media mentions," they continue to have probative value in terms of consumer exposure to the brand. In addition, applicant's argument that TOTAL receives negative media mentions does not serve to undercut a finding of regular exposure of the brand to consumers.

of business.  Steven D. Akerson (opposers' expert witness)

Test. 3-4; JA00002-3; Opp. Exh. 53; JA02692-2706.[19]

Applicant argues that the unaided awareness numbers are low

and that aided awareness is of no significance.  While

unaided awareness numbers are more significant, that does

not mean that aided awareness numbers have no significance.

Carefirst of Maryland Inc., 77 USPQ2d at 1506-07.  Based on

the record, opposers have shown that in the context of this

industry and fragmented market, the unaided awareness

numbers are high.  Moreover, the very high aided awareness

numbers have significance and have not been shown to be

compromised.  Nat'l Pork Bd. v. Supreme Lobster & Seafood

Co., 96 USPQ2d 1479 (TTAB 2010).

Finally, the trade publication Brandweek has

consistently recognized TOTAL as one of the top 2000

"Superbrands" in the United States.  See Opp. 1st NOR 0001-

269; JA05937-6205 (rankings from 1998 – 2008).

Applicant argues that the TOTAL brand is in general

decline and bases this argument primarily on decreasing

sales figures.  However, the record supports opposers'

position that, whatever the sales' ebb and flow, the brand

---

[19] Applicant's reference to its previous motion to strike the Akerson report has been given no consideration.  The Board already denied this motion in the November 2, 2009 order and, in addition, the order imposed sanctions on applicant prohibiting applicant from objecting to opposers' evidence.  However, we have reviewed the report and accorded it appropriate weight.

awareness has remained steady, even as competitive new entrants have further fragmented the market.[20]  See, e.g., O'Grady Test. pp. 10-16; JA00663-JA00669.

Based on the totality of the evidence, we find that, for purposes of likelihood of confusion, TOTAL is a famous mark for ready-to-eat cereal.  Having made this finding, we recognize that TOTAL, from its inception, is conceptually a suggestive mark in that it suggests a significant feature of the product, namely that it contains 100 percent of daily recommended vitamins and minerals.  If there were any doubt as to the suggestiveness of the mark, opposers' marketing makes clear the intended meaning of TOTAL in this context – total nutritional needs satisfied in one bowl.  In fact, opposers make this clear in the brief where they state "the TOTAL brand stands for 100 percent nutrition."  Br. p. 17. But even marks that enter the market as conceptually weak may attain fame and, consequently, the scope of protection afforded famous marks.  Opposers' product has been on the market for many years, and its mark has achieved a high level of exposure and recognition for several generations of American consumers.  In view of our finding, opposers' mark is entitled to broad protection.  Recot, 54 USPQ at 1897.

Goods, Trade Channels, Consumers, Conditions of Purchase

---

[20] We also note that sales began to increase in the last fiscal year for which we have evidence.  Clark Test. p. 59; JA00069.

This brings us then to our consideration of the similarities between opposers' and applicant's respective goods, channels of trade and classes of purchasers. We must make our determinations under these factors based on the goods as they are recited in the applications and registrations. See Octocom Systems Inc. v. Houston Computers Services, Inc., 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which sales of the goods are directed").

The respective goods do not have to be identical or even competitive in order to determine that there is a likelihood of confusion. It is sufficient that the respective goods are related in some manner, or the conditions surrounding their marketing must be such that the goods will be encountered by the same purchasers under circumstances that would give rise to the mistaken belief that they originate from the same source. See, e.g., On-line Careline Inc. v. America Online Inc., 229 F.3d 1080, 56 USPQ2d 1471 (Fed. Cir. 2000); In re Martin's Famous Pastry Shoppe, Inc., 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984)

31

(MARTIN'S for wheat bran and honey bread held likely to be confused with MARTIN'S for cheese).

Opposers argue that cereal and yogurt are sufficiently related to "give rise to the mistaken belief that they come from a common source" because 1) as breakfast foods they compete against one another for a share of the consumer's market basket and breakfast table, 2) they are commonly eaten together and, as such, are complementary products, and 3) yogurt is within opposers' natural zone of expansion.

In their opening brief, opposers assert that "[g]iven the close and complementary relationship between yogurt and ready-to-eat cereal, there is a strong danger that the public will mistakenly assume an association between yogurt and cereal products both using TOTAL marks." Br. p. 1.

Applicant is correct in its statement of the law that foods, even "breakfast foods," are not per se related. However, the evidence of record clearly establishes a close relationship between opposers' ready-to-eat cereal and applicant's yogurt given consumers' longstanding mixing of these types of products and the circumstances surrounding their marketing.[21]

---

[21] Applicant seeks to differentiate the products by essentially cordoning off Greek strained yogurt from yogurt generally and, thus, minimize the weight of opposers' evidence regarding the competitive and complementary nature of the goods. First, except for application Serial Nos. 75597291 and 75597292, which list "set yogurt" and "strained yogurt" respectively, the remaining applications merely list yogurt and are not specific as to Greek

Based on the evidence of record we find that:[22]

- Yogurt and ready-to-eat cereal are viewed and consumed as breakfast foods;[23]

- Yogurt and cereal compete for a share of consumers' market baskets and breakfast tables;[24]

- Consumers mix and consume yogurt and cereal together;[25]

- Consumers are regularly exposed to yogurt and cereal combined as a food product, both in the marketplace as a parfait and in the media in the form of information about eating options.[26]

---

or strained.  See In re La Peregrina Ltd., 86 USPQ2d 1645, 1646 (TTAB 2008) ("it is the identification of goods that controls, not what extrinsic evidence may show about the specific nature of the goods").  Moreover, all yogurt has multiple uses and the fact that applicant's yogurt is consumed at other meals or used as an ingredient for other dishes does not obviate the fact that it is consumed at breakfast, either with cereal or instead of it.

[22] We cite to merely a representative sample from this voluminous record.

[23] Clark Test. pp. 171-72; JA00128-129; Michele S. Meyer, opposers' President, Small Planet Foods, Natural and Organic Division, (hereinafter Meyer) Test. pp. 105-6; JA00622-623; O'Grady Test. p. 4, 47, 80-82, 96, 146; JA00691-738.

[24] Id.

[25] Id.  See also Opp. 3rd NOR 0633, 0756; JA07590, 7677; Opp. Exh. 48; JA02447-2449; App. Exh. 184; JA01481.  Much of the evidence here is under seal, however, suffice it to say that yogurt and cereal strongly skew as breakfast items in the consumers' mind and consumers frequently mix in various items with yogurt, including cereal.

[26] O'Grady Test. pp. 96, 146; JA00708, JA00738; Mindy Herman, Herman Group Inc., (hereinafter Herman) Test. pp. 31-38, JA00447-454.

Thus, the record clearly supports the complementary and competitive relationship between cereal and yogurt and the likely confusion resulting from the use of a famous cereal brand name on yogurt. Martin's, 223 USPQ at 1290.

With regard to opposers' position that yogurt is within its natural expansion of trade, under this doctrine the first user of a mark in connection with particular goods or services possesses superior rights in the mark as against subsequent users of the same or similar mark for any goods or services which purchasers might reasonably expect to emanate from it in the normal expansion of its business under the mark.[27] Mason Engineering and Design Corporation v. Mateson Chemical Corp., 225 USPQ 956 (TTAB 1985). Generally, this doctrine is used in the context of parties' dueling claims of priority. Id. (applicant argued it had priority because opposer's goods were within applicant's zone of expansion of the goods in its prior registration). But see Time Warner Entertainment Co. v. Jones, 65 USPQ2d 1650 (TTAB 2002) (evidence of licensing ROADRUNNER mark on wide variety of goods and use of another mark BUGS BUNNY on maps supported finding that road maps were within the

---

[27] Applicant cites to Accu Personnel, Inc. v. Accustaff, Inc., 30 USPQ2d 1497, 1507 (D. Del. 1994). However, that case involves another species of "zone of expansion" that concerns the geographic extent of use and a plaintiff's natural, geographic zone of expansion. That is not in issue in this case. Before the Board this type of expansion is more relevant in a concurrent

natural area of expansion of products for plaintiff); May

Department Stores Co. v. Prince, 200 USPQ 803 (TTAB 1978)

(shampoo is natural expansion from plaintiff's health and

beauty aids inasmuch as shampoo falls within the category of

health and beauty aids).  Moreover, this doctrine requires a

specific analysis that does not appreciably add to our

understanding of the relatedness of the goods in this

case.[28]

Opposers' arguments and evidence presented under this

doctrine are better analyzed by simply adding to our

understanding of consumer perceptions regarding these goods

---

use proceeding.  See  Weiner King, Inc. v. The Wiener King Corp., 615 F.2d 512, 204 USPQ 820 (CCPA 1980).

[28] The factors to be considered are 1) whether the second area of business (that is, the subsequent user's area of business, into which the first user has or potentially may expand) is a distinct departure from the first area of business (of the prior user), thereby requiring a new technology or know-how, or whether it is merely an extension of the technology involved in the first area of business, 2) the nature and purpose of the goods or services in each area, 3) whether the channels of trade and classes of customers for the two areas of business are the same, so that the goodwill established by the prior user in its first area of business would carry over into the second area, 4) whether other companies have expanded from one area to the other, and 5) the determination must be made on the basis of the circumstances prevailing at the time when the subsequent user first began to do business under its mark, i.e., what was "natural" in the relevant trade at that time.  Mason, 225 USPQ 956 at 962.

As noted in the McCarthy treatise, this doctrine "appears to be no more than a specific application of the familiar 'related goods' test.  The 'natural expansion' thesis seems to be nothing more than an unnecessarily complicated application of the likelihood of confusion of source or sponsorship test to a particular factual situation.  If the 'intervening' use was likely to cause confusion, it was an infringement, and the senior user has the right to enjoin such use, whether it had in fact already expanded itself or not."  McCarthy, J.T., McCarthy on Trademarks and Unfair Competition §24:20 (4th ed. updated 2011).

and whether they are related in the minds of consumers in a way that is likely to cause confusion.

The record shows that opposers, through their Yoplait Division, have a history of making and selling yogurt. It is undisputed in the record that, in the past, opposers have sold a yogurt with grains already mixed in and with grains as a mix-in packaged on the top cap of the yogurt container. O'Grady Test. pp. 92-96; JA00734-738. Starting in approximately 2007, opposers began using their cereal brand names TRIX and FIBER ONE on their Yoplait branded yogurt. O'Grady Test. pp. 92-96; JAO0734-738; Meyer Test. pp. 112-113; JA00629-630). Examples of packaging are shown below:

29 30

Opposers cross-promote their yogurt and cereal products, as shown by the cereal packaging below.[31]

---

[29] Opp. Exh. 82; JA03086.

[30] Opp. Exh. 84; JA03089.

[31] Opposers also engage in a seasonal cross-marketing associated with breast cancer awareness promotion and cross promotion in relation to health benefits and breakfast options. O'Grady Test. p. 57; JA00700.

[32]

In addition, opposers offer cereal with "yogurt coated clusters."[33]

[34]

At a minimum, this evidence shows that 1) a natural progression reflecting consumers' eating habits, namely mixing cereal with yogurt, has occurred in the marketplace, as yogurt is sold with a packet of cereal to mix in or with the cereal brand name used for the yogurt itself, and 2) consumers are exposed to yogurt and cereal being either marketed together or cross marketed.

---

[32] Opp. Exh. 45; JA02436.

[33] This product is not actually yogurt, although it is yogurt-flavored.

[34] Opp. Exh. 46; JA02438.  See also Clark Test. pp. 168-169, 173; JA00125-126, 130.  During this lengthy litigation opposers also offered, for a time, a TOTAL branded yogurt-flavored cereal. Opp. Exh. 14; JA02285; Clark Test. pp. 40-41; JA00054-55.

The evidence of record supports a finding that yogurt and ready-to-eat breakfast cereal are related in the minds of consumers such that use of a similar mark, in particular a famous mark, would give rise to a likelihood of confusion.[35] Martin's Pastry, 223 USPQ 1289.

With regard to the channels of trade and classes of purchasers, absent restrictions in the identifications as to trade channels and purchasers, we must presume that the parties' goods would be sold in all ordinary channels of trade for those goods. See Hewlett-Packard Co. v. Packard Press Inc., 281 F.3d 1261, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002); and Octocom, 16 USPQ2d at 1787.

The parties' goods are simple consumer food items that would be sold wherever groceries are sold and the record establishes that cereal and yogurt are sold in the same stores, including grocery stores, convenience stores, drugstores, and mega stores. As such, the channels of trade

---

[35] Even applicant has marketed a product that combines cereal in yogurt. See O'Grady Test. Exh. 94 (page from applicant's website displaying yogurt product that contains cereal and fruit); JA03127. However, based on this record this product is not marketed in the United States.

Opposers' evidence of third-party registrations submitted to show yogurt and cereal registered under a single mark, has little probative value. Many are registered for a wide range of goods under Section 44 and, as such, have no probative value on this point. In re Albert Trostel & Sons Co., 29 USPQ2d 1783, 1786 (TTAB 1993) (third-party registrations issued under Section 44(e) of the Trademark Act, without any use in commerce basis, have very little persuasive value). One, Registration No. 3230950 for the mark YOVANNA for, inter alia, "yogurt ... granola, granola-

38

and purchasers overlap.  However, as has long been held, the presence of goods in the same store does not necessarily lead to the conclusion that confusion would arise under such conditions.  Interstate Brands Corp. v. Celestial Seasonings Inc., 576 F.2d 926, 198 USPQ 151, 153 (CCPA 1978); Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976).  In this regard, while cereal is frequently in the center aisle and yogurt is in the refrigerated section on the perimeter of a store, the record shows increasing utilization of smaller refrigerated units, display bunkers, which are used in grocery stores where dairy products, including yogurt, are placed next to cereal. Meyer Test. 101-4; JA00618-621; O'Grady Test. pp. 56-57; JA00699-700.  Further, the record shows that opposers promote cereal in the dairy aisle and yogurt in the cereal aisle.  Opp. Exh. 81; JA03057-3085; O'Grady Test. 57-59; JA00700-702.  In view of these marketing conditions within the overlapping channels of trade, this factor tips in favor of opposers.

Finally, not only do the purchasers overlap in general inasmuch as these are relatively low-cost food items purchased by a broad range of ordinary people, more specifically, there is a strong overlap in the parties' consumer base in the sector of the health-conscious

---

based snack bars," while on point, is not by itself enough upon

consumer, which is reflected in both parties' advertising. Consequently, these products are targeted at and purchased by the same types of consumers. O'Grady Test. pp. 32-33, 81; JA00681-682, 724; Opp. Exh. 48; JA02447-2449; Clark Test. 182-83; JA00136-137.

As to the conditions of purchase, groceries are generally purchased on impulse at the shelf and the consumer decision is made fairly quickly. Meyer Test. 95-105; JA0612-622; O'Grady Test. pp 60-63; JA00703-706. In addition, the record shows the goods involved are relatively inexpensive. Clark Test. p. 272; JA00198; Filippou Test. pp. 359-60; JA0417-418. Generally, purchasers of casual, low-cost ordinary consumer items exercise less care in their purchasing decisions and are more likely to be confused as to the source of the goods. Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., 748 F.2d 669, 223 USPQ 1281 (Fed. Cir. 1984); and Eveready Battery Co. v. Green Planet Inc., 91 USPQ2d 1511 (TTAB 2009). Although some of the parties' more health-conscious consumers may be more careful in their purchase, we must base our decision on the least sophisticated potential purchasers. E.g., Giersch v. Scripps Networks Inc., 90 USPQ2d 1020, 1027 (TTAB 2009) (citing Alfacell Corp. v. Anticancer, Inc., 71 USPQ2d 1301, 1306 (TTAB 2004)).

---

which to base a finding of relatedness.

<u>Similarity of the Marks</u>

We turn now to a consideration of the first du Pont factor, i.e., whether applicant's marks that incorporate the term TOTAL and opposers' mark TOTAL are similar or dissimilar when compared in their entireties in terms of appearance, sound, connotation and commercial impression. We make this determination in accordance with the following principles. The test, under this du Pont factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impressions that confusion as to the source, sponsorship or affiliation of the goods offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. See Sealed Air Corp. v. Scott Paper Co., 190 USPQ 106 (TTAB 1975).

For our analysis, we separate the 15 marks into two sets of applications. Opposers, it appears, believe the marks should all be considered together, arguing that "[applicant] seeks to register a family of fifteen marks for its TOTAL brand yogurt ... [such that] TOTAL is the family name (in this case, the product brand) that unites all fifteen trademarks for varieties of [applicant's] TOTAL yogurt [and i]n comparing [applicant's] family of TOTAL

41

marks to [opposers'] TOTAL mark, the question is not whether each of [applicant's] marks is similar to the TOTAL mark, but whether the family name TOTAL is similar to [opposers'] TOTAL mark."  Br. p. 34.

To be clear, as noted infra, because each application stands alone we must make our determination as to each mark in each application.  The issue here concerns the marks which applicant seeks to register, not simply one component of them; while some features of applicant's marks may be more prominent than others, in the end we must consider each of applicant's marks as a whole.  Moreover, in determining likelihood of confusion, we consider whether each of applicant's separate marks is similar to either of opposers' marks.  Opposers' reliance on Black & Decker Corp. v. Emerson Elec. Co., 84 USPQ2d 1482 (TTAB 2007) is misplaced. In that case, the Board found that the plaintiff had established a family of "HOG" marks, and that applicant's separate marks DIRT HAWG and WATER HAWG would be perceived as part of plaintiff's family.  However, for ease of explanation, it is appropriate to group applicant's marks for a similarity analysis where similar characteristics exist that lead to likely confusion.

The first set of seven includes the marks in Application Serial Nos. 75597291; 75597292; 76016809; 76016810; 76016811; 76016812; and 76016813.  See supra.  In

42

this set of seven applications, the word TOTAL is clearly the most prominent and memorable component of the mark.  All of the additional English wording is descriptive, and has been disclaimed:  "sheeps' yogurt," "authentic Greek tzatziki," "light, the authentic Greek strained yogurt," "with Greek honey the authentic Greek strained yogurt," "2%," and "cherry, the authentic Greek strained yogurt."

The design elements comprise a simple background design, for example the lines in Application Serial No. 76016812, or are visually suggestive of the ingredients or origin of the product, for example, the sheep in Application Serial No. 75597291, the honeycomb and Greek ionic columns in Application Serial No. 76016811, the traditional Greek architecture in Application Serial No. 76016809, and the cherry and Greek ionic columns in Application Serial No. 76016813.[36]  The word ΦΑΓΕ (FAGE) appears in Greek lettering in each of these marks.  To the American consumers who cannot read or recognize the Greek alphabet, this would appear as a design element, or, at a minimum, not be pronounceable and not used by the consumer to call for the

---

[36] Opposers also argue that the similarity is "compounded by [applicant's] decision to use font, styling, and color schemes on its packaging that are quite similar to TOTAL cereal."  Reply Br. p. 10.  As to any similarity in color, applicant's drawings are in black and white and applicant does not claim color as a feature of the mark.  While we may consider trade dress to fully address the question of commercial impression, in this case we find it unnecessary to do so, given the other points of similarity.  Kenner Parker Toys Inc., 22 USPQ2d at 1458.

goods.  Moreover, because of this, it is unlikely to be perceived by such consumers as a house mark.

We further find that the common element TOTAL evokes the same meaning of "complete nutrition" in applicant's and opposers' marks.  See Opp. Exhs. 1, 3; JA02272, 2274; App. Exhs. 176, 178; JA01349-1374, 1377-1382.

Clearly, in these marks consumers will focus on the word TOTAL as the source-identifying element.  It is well settled that marks must be considered in their entireties, not dissected or split into component parts and each part compared with other parts.  It is the impression created by the involved marks, each considered as a whole, that is important.  See Kangol Ltd. v. KangaROOS U.S.A. Inc., 974 F.2d 161, 23 USPQ2d 1945 (Fed. Cir. 1992).  However, "[t]hat a particular feature is descriptive [or otherwise lacking in distinctiveness] ... with respect to the involved goods or services is one commonly accepted rationale for giving less weight to a portion of a mark."  In re National Data Corp., 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985)  Moreover, in general, wording dominates over design.  In re Appetito Provisions Co. Inc., 3 USPQ2d 1553, 1554 (TTAB 1987).

The second set of eight marks includes Application Serial Nos. 77027793; 77037808; 77037835; 77037851; 77037869; 77037897; 77037905; and 77037924.  See supra. This group of marks, wherein the TOTAL portion is depicted

in smaller font in the middle of the marks, was adopted in 2006, six years after the original oppositions were filed and about midway through this litigation.

The analysis is the same with regard to the other wording and design elements present in these marks. As compared to the descriptive wording and the design elements, the word TOTAL continues to be more dominant, despite its diminution in size. However, in these marks, the additional word FAGE (this time in Roman letters), presented in larger typeface and emphasized by the background banner design is also a strong source identifier and, as applicant argues, could be perceived as a house mark. The problem, however, is that even if consumers perceive these marks such that FAGE is the house mark and TOTAL is the product mark, this would not dispel likely confusion as to sponsorship or affiliation. In general, use of a house mark does not obviate confusion. In re Mighty Leaf Tea, 601 F.3d 1342, 94 USPQ2d 1257, 1260 (Fed. Cir. 2010).

The exceptions to this general rule are where 1) the marks in their entireties convey significantly different commercial impressions, or 2) the matter common to the marks is not likely to be perceived by purchasers as distinguishing source because it is merely descriptive or diluted. Shen Mfg. Co. v. Ritz Hotel Ltd., 393 F.3d 1238, 73 USPQ2d 1350 (Fed. Cir. 2004) (RITZ and THE RITZ KIDS

create different commercial impressions); Citigroup Inc. v. Capital City Bank Group, Inc., 94 USPQ2d 1645 (TTAB 2010), aff'd, 637 F.3d 1344, 98 USQ2d 1253 (Fed. Cir. 2011) (CAPITAL CITY BANK held not likely to be confused with CITIBANK). Neither exception applies here.

Applicant argues that its "famous" house mark, FAGE, sufficiently distinguishes the marks with the common element TOTAL. We first note that the du Pont factors only list fame of the *prior* mark as relevant to our analysis, and the fame of a prior mark under our jurisprudence does not minimize confusion but rather is a factor strongly supporting a finding of likely confusion. Kenner, 22 USPQ2d at 1456-57. Moreover, a junior party's fame cannot excuse likelihood of confusion created by its use of a mark similar to one already in use. See In re Christian Dior, S.A., 225 USPQ 533 (TTAB 1985) (inclusion of applicant's house mark in LE CACHET DE DIOR does not obviate confusion with registrant's CACHET mark and in fact may serve to aggravate confusion).

In any event, while the record establishes that applicant's TOTAL yogurt has been successful, the record does not show the level of advertising and household penetration of the FAGE mark needed to establish fame.

Of course, where the common element of the marks is "weak" in that it is highly suggestive of the goods, other

46

matter in the marks may be sufficient to avoid likely confusion. In re Bed & Breakfast Registry, 791 F.2d 157, 229 USPQ 818 (Fed. Cir. 1986). However, here opposers' TOTAL mark is famous, and while both marks are suggestive, we do not find them to be so highly suggestive that the use of applicant's house mark FAGE (along with other descriptive and non-distinctive matter) is sufficient to eliminate likely confusion with a famous mark, when used on related goods, in particular in a marketplace where consumers themselves combine these goods and are exposed to food products offered for sale that combine these goods and brand names. The facts presented here, where opposers' asserted mark, TOTAL, is famous, are quite different from the facts in General Mills Inc. v. Kellogg Co., 824 F.2d 622, 3 USPQ2d 1442 (8th Cir. 1987), relied upon by applicant. In that case, Kellogg claimed that General Mills' use of OATMEAL RAISIN CRISP infringed on its mark APPLE RAISIN CRISP; however, the court found that plaintiff's mark APPLE RAISIN CRISP was weak. See also, Worthington Foods Inc. v. Kellogg Co., 732 F. Supp. 1417, 14 USPQ2d 1577 (S.D. Ohio 1990) (HEARTWISE weak and use of house marks served to dispel likely confusion). Given the fame of opposers' mark, the differences in overall commercial impression are not sufficient to outweigh the similarity caused by use of the identical term TOTAL.

47

In view of the above, we find that the points of similarities in sound, appearance, connotation and overall commercial impression, outweigh the dissimilarities. Thus, we find each of applicant's marks to be similar to opposers' TOTAL mark.

### Third-Party Use/Failure to Police

Applicant also submitted evidence and argument on the du Pont factors of third-party use and opposers' failure to police their mark.

With regard to third-party use of the term TOTAL, the vast majority of the evidence pertains either to very unrelated products, e.g., COLGATE TOTAL for toothpaste, OLAY TOTAL EFFECTS for skin cream, TIDE TOTAL CARE for laundry detergent, or for more closely related products that use the term "totally" as part of an informative phrase, e.g., TOTALLY VANILLA for yogurt or ANNIE'S HOMEGROWN TOTALLY NATURAL HONEY BUNNIES for toasted oat and corn cereal. Overall, we do not find this evidence sufficient to limit the scope of protection of the famous TOTAL mark, and in particular when it is presented and would be perceived by consumers as a brand name.

Applicant specifically focuses on one third-party use and registration by Bally Total Fitness of its mark BALLY TOTAL FITNESS on a variety of goods, including snack bars, yogurt-based beverages, grain-based food and frozen yogurt.

48

As opposers state, and the record reflects, "Bally's has never sold its products in grocery stores, a fact that General Mills confirmed when it decided not to prosecute to conclusion its opposition to the Bally's marks." Opp. Br. pp. 44-45 and citations to the record.

Suffice it to say, we cannot find, based on the BALLY TOTAL FITNESS marks combined with applicant's registration for FAGE FETA TOTAL for cheese, that opposers have "abandoned" TOTAL or even that this "acquiescence to use and registration" of these specific marks makes "indefensible" opposers' position that use of TOTAL as a brand name for yogurt is likely to cause confusion. App. Br. pp. 36-37.

### Actual Confusion

Applicant argues that despite over twelve years of concurrent use of the products under the brand name TOTAL there is no evidence of actual confusion.[37] "A showing of actual confusion would of course be highly probative, if not conclusive, of a high likelihood of confusion. The opposite is not necessarily true, however. The lack of evidence of actual confusion carries little weight." Majestic, 65 USPQ2d at 1205, citing J.C. Hall Co. v. Hallmark Cards, Inc., 340 F.2d 960, 964, 144 USPQ 435, 438 (CCPA 1965). See also Herbko Int'l, Inc. Kappa Books, Inc., 64 USPQ2d 1375,

---

[37] We have given opposers' purported "anecdotal instances of consumer confusion," namely a "tweet" found on Twitter by some person in the virtual world, no probative value.

49

1380 (Fed. Cir. 2002) (showing of actual confusion not necessary to establish a likelihood of confusion).

The lack of evidence of actual confusion occurring over a significant period takes on greater weight if it can be shown that there have been meaningful opportunities for such confusion to occur. Based on this record, the time period for which a meaningful opportunity to exist is somewhat more limited than is apparent at first blush. Contrary to applicant's claim that the time period of meaningful contemporaneous use is twelve years, the significant period is closer to three years. Although applicant's yogurt has been sold in the United States since 1998, during the first year sales were limited to local ethnic stores. Filippou Test. pp. 41-43; JA00293-296. Thereafter, applicant began selling its yogurt in upscale or specialty grocery stores such as Whole Foods and Trader Joe's. Id. at 44, 349; JA00297, 414. There is nothing in the record to establish that opposers sell their TOTAL cereals in these stores. Over time, applicant expanded into more "mass market" stores such as Safeway, Publix and Costco, both in terms of geographic distribution and sales. Id. pp. 204-206; JA00376-378. Applicant relies on certain testimony to show that ample opportunity for actual confusion has existed, however, this testimony, at best, is vague as to where and when applicant's products were sold and, at worst, confirms

that it was not until 2008 when applicant completed its production plant in New York state that it greatly expanded into more mass market retailing nationwide.  App. Fifth NOR, Exh. 6 pp. 38-39 (2008 deposition of Mr. Ioannis Papageorgiou, president of Fage USA Dairy Corporation); JA05907-5908.  See also, App. Fifth NOR, Exh. 7 pp. 26, 75 (2008 deposition of Mr. Antonios Maridakis, Executive Vice President, Sales and Marketing for Fage USA Dairy Corporation); JA05918; 5921.

At a minimum, the record is not clear as to when applicant expanded its distribution to include the same stores where opposers sell their TOTAL cereal.

Applicant's advertising history followed a similar pattern, starting as essentially word-of-mouth and then expanding into more high-end exposure in such magazines as Vogue, Gourmet, Food & Wine and The New Yorker, and sampling tours in the Hamptons, Beverly Hills, and Miami.  Later, applicant's advertisements and media mentions expanded into more general interest publications.  In sum, based on this record, meaningful opportunities for actual confusion to occur span at most three years.

We add that, with these grocery products, it is not clear from the record that, even if confusion did occur, consumers would report such confusion, making evidence of actual confusion difficult to obtain.  In general, evidence

of actual confusion is notoriously difficult to come by and, in particular, where relatively inexpensive items such as food products are involved, confusion about sponsorship or affiliation would not necessarily be brought to the attention of either applicant or opposers.  Helene Curtis Industries Inc. v. Suave Shoe Corp., 13 USPQ2d 1618, 1623 (TTAB 1989).  As to this factor, we find it to be neutral, and to the extent any inference could be made in applicant's favor, it would not outweigh the other relevant du Pont factors discussed herein.

Finally, in connection with its argument that there is no evidence of actual confusion, applicant requests the Board to make an adverse inference based on opposers' failure to conduct a likelihood of confusion survey.  It is well-established that we do not make such adverse inferences.  McDonald's Corp. v. McClain, 37 USPQ2d 1274, 1277 (TTAB 1995).[38]

**DETERMINATION**

We have carefully considered all of the evidence pertaining to the relevant du Pont factors, as well as all of the parties' arguments with respect thereto, including any evidence and arguments not specifically mentioned or discussed in this opinion.  In balancing the relevant

---

[38] We note that if applicant believed that a survey would have supported its position it was, of course, free to conduct one itself.

factors, we conclude that because opposers' TOTAL mark is famous, the similarities in the marks in their entireties outweigh the dissimilarities, the goods are related, travel in the same channels of trade and are purchased by the same consumers, the goods are low-cost items such that the conditions of purchase are more vulnerable to confusion, third-party use is either not relevant or minimal, and the lack of actual confusion is not highly probative, there is a likelihood of confusion between opposers' TOTAL marks and applicant's TOTAL marks.

Finally, it is a well-established principle that one who adopts a mark similar to the mark of another for the same or closely related goods does so at his own peril, and any doubt as to likelihood of confusion must be resolved against the newcomer and in favor of the prior user or registrant. See W.R. Grace & Co. v. Herbert J. Meyer Industries, Inc., 190 USPQ 308 (TTAB 1976). The Court of Appeals for the Federal Circuit in Recot took this principle even further in the case of a famous mark. "When a famous mark is at issue, a competitor must pause to consider carefully whether the fame of the mark, accorded its full weight, casts a 'long shadow which competitors must avoid.'" Recot, 54 USPQ2d 1894 at 1897. The Court went on to quote Nina Ricci S.A.R.L. v. E.T.F. Enters., 889 F.2d 1070, 1074, 12 USPQ2d 1901, 1904 (Fed. Cir. 1989): "There is no excuse

53

for even approaching the well-known trademark of a competitor."

In view of our determination as to the likelihood of confusion claims, we do not reach the claims of dilution by blurring.

**Decision**:  Opposition No. 91155075, which involves Application Serial No. 76016809, is dismissed as to the goods in International Class 30 and sustained as to the goods in International Class 29.  Application Serial No. 76016809 will proceed to registration solely with respect to the goods in International Class 30.  The remaining oppositions are sustained.